IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AFC FRANCHISING, LLC, et al.,               )
                                            )
          Plaintiffs,                       )
                                            )
     v.                                     )
                                            )
FAIRFAX FAMILY PRACTICE, INC., et al.,      )
                                            )
          Defendants.                       )
_____     )     1:18-cv-1356 (LMB/IDD)
                                            )
FAIRFAX FAMILY PRACTICE, INC., et al.,      )
                                            )
          Defendants counterclaimants,      )
                                            )
     v.                                     )
                                            )
AFC FRANCHISING, LLC, et al.,               )
                                            )
          Plaintiffs counter-defendants.    )

## MEMORANDUM OPINION

Before the Court is plaintiffs AFC Franchising, LLC ("AFCF") and Irwin Holdings,

LLC's ("Holdings") (collectively, "plaintiffs" or "plaintiffs counter-defendants") Motion for

Attorney Fees, in which plaintiffs seek $160,147.50 in attorneys' fees and $3,206.73 in costs, for

a total award of $163,354.23. For the reasons stated below, this motion will be granted in part

and plaintiffs will be awarded a total of $132,164.23, consisting of $128,957.50 for attorneys'

fees and $3,206.73 for costs.

## I.   BACKGROUND

In this civil action, plaintiffs alleged that defendants Ahmad Fazal Nusrat ("Nusrat") and

Fairfax Family Practice, Inc.'s ("FFP") (collectively, "defendants" or "defendants

counterclaimants") continued to use plaintiffs' trademarks, service marks, and franchise system ("AFC Marks") in the operation of an urgent care center after the agreement which authorized them to use such marks was terminated due to defendants' breach and failure to pay contractually required royalties. Compl. [Dkt. No. 1].

AFC operates and licenses others to operate urgent care centers under the AFC Marks, which are owned by Holdings. [Dkt. No. 73] ¶ 1. On June 12, 2014, AFCF and FFP entered into a Franchise Agreement, under which FFP was authorized to use the AFC Marks to operate an AFC Urgent Care Center for 15 years at a particular location—334 Elden Street, Herndon, VA 20170—and was obligated to pay a six percent royalty fee on a weekly basis, which AFCF had the right to obtain via electronic debit. Id. ¶¶ 3, 4, 5, 7. Under the Franchise Agreement, if FFP defaulted on its payment obligation and failed to cure within five days after notice of default, AFCF had the right to terminate the agreement. Id. ¶ 9. The Franchise Agreement also provided that FFP could be deemed in default for a variety of other reasons, including if it became insolvent or failed to promptly pay its suppliers. [Dkt. No. 1-1] ¶¶ 14.1, 14.2, 14.3. The agreement further provided that both FFP and Nusrat would be responsible for AFCF's attorneys' fees if FFP breached the agreement. Id. ¶ 17.3.

In 2017 and 2018, defendants' financial troubles became apparent. In addition to being in default on their obligations to other creditors, id. ¶¶ 17, 29, defendants defaulted on their royalty payments to AFCF and were put on a payment plan, id. ¶ 14. Throughout 2017 and 2018, Nusrat requested multiple royalty deferrals, and threatened to turn off AFCF's access to FFP's bank account if his requests were not granted. Id. ¶¶ 15, 16. Although AFCF granted Nusrat multiple royalty deferrals, in July 2018, Nusrat shut off the electronic debit function on FFP's operating account, which prevented AFCF from exercising its right under the Franchise Agreement to

2

collect current royalty payments and the past due amounts on its royalty deferrals. Id. ¶¶ 15, 16, 19.

On July 17, 2018, AFCF sent defendants a Notice of Default, advising them that they were in default for failing to pay amounts owed to AFCF totaling $13,062.18 and for blocking AFCF's access to the electronic debit. Id. ¶ 20; [Dkt. No. 1-2]. AFCF gave defendants 30 days' notice to cure, but defendants failed to do so. [Dkt. No. 73] ¶¶ 20, 24. On August 29, 2018, AFCF sent defendants notice that the Franchise Agreement would terminate if the past due amounts were not cured within five days. Id. ¶ 28. Defendants failed to cure, and the Franchise Agreement was terminated. Id.

Despite termination of the Franchise Agreement, defendants continued until at least October 2018 to operate an urgent care center at the same location using the AFC Marks. Id. ¶ 30. Plaintiffs also alleged that defendants continued to use the AFC Marks on social media. Id. ¶ 32. This behavior violated the Franchise Agreement, which stated that upon termination, FFP would discontinue all use of the AMC Marks. [Dkt. No. 1-1] ¶ 15.2.

In their 12-Count Complaint, plaintiffs sought a declaration that the Franchise Agreement was validly terminated and that the continued operation of the urgent care center violated the Franchise Agreement (Counts 1, 5). They also alleged breach of the Franchise Agreement (Counts 2-4), federal and state trademark, service mark, and trade dress infringement (Counts 6, 8), unfair competition in violation of the Lanham Act and state law (Counts 7, 9), and unjust enrichment (Count 10). Plaintiffs also sought attorneys' fees and costs (Count 11), a personal guaranty against Nusrat (Count 12), an injunction, and damages, including past due royalties and lost future royalties.

3

Plaintiffs moved for a temporary restraining order on November 1, 2018 [Dkt. No. 5]. On November 15, 2018, a consent preliminary injunction was entered, which barred defendants from using or displaying the AMC Marks. [Dkt. No. 23]. On December 21, 2018, defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which the Court denied on January 24, 2019, finding that "most of defendants' arguments amount to form over substance disputes as to how the Complaint is structured." [Dkt. No. 49] at 4.

Along with their answer to the complaint, defendants filed two counterclaims alleging that AFCF's termination of the Franchise Agreement was improper. Specifically, defendants argued that AFCF failed to provide notice of defendants' default to FFP's principal lender, and that AFCF violated the Virginia Retail Franchise Act, Va. Code § 13.1-564 by terminating the Franchise Agreement without reasonable cause. Defendants' first counterclaim was premised on the dubious argument that defendants were the intended third-party beneficiaries of a contract between AFCF and defendants' principal lender. Defendants claimed $2,000,000 in damages, although there was little if any support for this figure, particularly because defendants failed to disclose a damages calculation in their initial disclosures and did not designate a witness other than Nusrat to testify about damages.

The parties engaged in settlement negotiations over several months, which culminated in an unsuccessful settlement conference on June 13, 2019 before the magistrate judge assigned to this action. The day after the settlement conference, four of the five attorneys representing defendants[1] withdrew from the action, "pursuant to Rules 1.16(b)(1), (3), (4), and (5), and 1.16(c), of the Virginia State Bar Rules of Professional Conduct" in part because "there is a

---

[1] At the time of this withdrawal, the fifth attorney, Vincent Amberly, represented Nusrat but not FFP. He subsequently filed a notice of appearance on behalf of FFP as well.

fundamental disagreement among counsel . . . and [d]efendants regarding case proceedings, settlement, damages, and claims, that prevent . . . counsel from continuing as legal representation in the matter." [Dkt. No. 67] ¶ 9. Although the Court had previously set a summary judgment briefing schedule, it suspended that schedule to enable FFP to find new counsel, [Dkt. No. 69], which FFP did. The action then lay dormant for several months.

As of January 5, 2020, defendants' remaining counsel's license to practice law in Virginia was suspended for six months. In light of this development and because neither party had filed a motion for summary judgment, on January 14, 2020, the Court ordered plaintiffs to show cause why the action should not be dismissed for failure to prosecute, and ordered defendants' counsel to show cause why he had not withdrawn from the action given his bar suspension. In response, defendants' counsel withdrew from representing defendants, and defendants identified new counsel. Plaintiffs promptly filed a motion for summary judgment, which defendants moved to strike, arguing that because plaintiffs failed to abide by the Court's original summary judgment briefing schedule, plaintiffs' motion should be stricken as untimely. Although the Court concluded that "neither side has handled this action optimally," it found that plaintiffs' motion was not untimely because the summary judgment briefing schedule had been suspended, and it was "appropriate to resolve this matter on the merits." [Dkt. No. 88].

A hearing on plaintiffs' motion for summary judgment was held on February 28, 2020. The Court found that none of defendants' counterclaims had merit and granted plaintiffs' motion for summary judgment on those counts. The Court also granted summary judgment in plaintiffs' favor as to their claims,[2] except that it concluded that plaintiffs' claim for lost future royalties

---

[2] Plaintiffs' complaint included breach of contract claims and an equitable claim for unjust enrichment. As the Court stated in denying defendants' motion to dismiss, "[a]t the pleading stage, a plaintiff may allege alternative theories of recovery, but obviously cannot recover under

was too speculative. The Court awarded plaintiffs $24,091.00 in past-due royalties and $5,420.48 in interest. The Court also ordered the parties to attempt to reach agreement on a proposed permanent injunction and an award of attorneys' fees and costs.

Despite the Court's order, plaintiffs reported that defendants failed to engage in cooperative discussion about the proposed injunction. On April 27, 2020, after a tele-conference with the parties, the Court issued the plaintiffs' proposed injunction with certain modifications requested by defendants. The injunction provided that defendants may not use or display the AFC Marks.

The parties also failed to reach agreement as to attorneys' fees and costs, and each side has filed a memorandum with the Court detailing its position on the issue. Plaintiffs seek $160,147.50 in attorneys' fees and $3,206.73 in costs. In support of their motion, plaintiffs have submitted the following chart which breaks down the number of hours spent by each attorney:[3]

| Name | Years in Practice | Total Hours | Billing Rate (January 1, 2019-present) | Total Billed |
|---|---|---|---|---|
| James C. Rubinger | 40 | 361.2 | 400 | $150,710.00 |
| Regina B. Amolsch | 23 | 0.5 | 400 | $200.00 |
| Valerie K. Brennan | 25 | 0.2 | 400 | $80.00 |
| John W. Edson | 4 | 10.5 | 275 | $2,887.50 |
| Margaret Naylor | 1 | 8.1 | 200 | $1,620.00 |
| Elizabeth Brugger | Legal assistant | 17.1 | 125 | $2,137.50 |
| Kimberli Cox | Legal assistant | 20.1 | 125 | $2,512.50 |

both theories." [Dkt. No. 49] at 5. Because the Court ruled in plaintiffs' favor on its breach of contract claims, it did not rule on their claim for unjust enrichment.

[3] There are a variety of errors in this chart. The chart lists the total number of hours as 424.1, but combining the hours listed in the chart yields a total of 417.7. Moreover, the chart states that Rubinger billed $150,710.00, but multiplying his total number of hours times his billing rate yields a total of $144,480.00.

| GRAND TOTAL | | 424.1 | 377.61 | $160,147.50 |
|---|---|---|---|---|

Plaintiffs clarified that they have already excluded from the request the hours spent on the unsuccessful claim for future royalties.

Although defendants maintain their objections to the summary judgment ruling, they do not dispute that attorneys' fees are available under the Franchise Agreement; however, they argue that plaintiffs' attorneys' fees award should be limited to $25,000, because a larger award would be inconsistent with the amount of damages obtained and would reward plaintiffs for "invoking the 'nuclear option'" and terminating defendants' franchise over a relatively small amount of overdue royalties. [Dkt. No. 99] at 3. Defendants argue in the alternative that if "the Court is inclined to award [p]laintiff the fees incurred throughout the entire litigation," the fee award should be less than half what plaintiffs request, because plaintiffs' counsel inappropriately used partners to perform work that could have been delegated to associates, spent an unreasonably long amount of time performing certain tasks, and charged for hours spent representing AFCF in a separate case. Id. at 4. Defendants submit that $67,500 would be an appropriate number. Although it is not entirely clear how defendants reached this figure, it appears that they took roughly half of the hours plaintiffs' counsel spent on the case and multiplied by a lower hourly rate to account for plaintiffs' reliance on partners to perform tasks that defendants assert should have been performed by associates. Defendants do not challenge plaintiffs' request for costs.

## II.   STANDARD OF REVIEW

There is no question that plaintiffs are entitled to attorneys' fees under Section 17.3 of the Franchise Agreement, which provides: "[i]f we [AFCF] incur costs and expenses due to your [FFP's] failure to pay when due amounts owed to us, to submit when due any reports,

7

information, or supporting records, or otherwise to comply with this Agreement, you agree, whether or not we initiate a formal legal proceeding, to reimburse us for all of the costs and expenses that we incur, including, without limitation, reasonable accounting, attorneys' and related fees." [Dkt. No. 1-1] ¶ 17.3. Moreover, in denying defendants' motion to dismiss, the Court held that "if a breach [of the Franchise Agreement] were to be found, both FFP and Nusrat would be liable for attorney's fees and costs," [Dkt. No. 49] at 4 n.3, because Nusrat signed a Personal Guaranty of the Franchise Agreement, which holds him liable to "render any payment . . . required under the Agreement . . . if the Franchisee fails or refuses punctually to do so." [Dkt. No. 1-1] at 56-57.

The next question is whether the requested amount of fees is appropriate. "[C]ourts evaluate attorney's fees under a reasonableness standard." In re Abrams & Abrams, P.A., 605 F.3d 238, 243 (4th Cir. 2010); accord Chawla v. BurgerBusters, Inc., 255 Va. 616, 499 S.E.2d 829, 833 (1998) (explaining that the party seeking fees under contractual provision must show that the fees are reasonable). In answering this question, courts in the Fourth Circuit engage in a three-step analysis. First, a court must determine a lodestar figure by "multiplying the number of reasonable hours expended times a reasonable rate." Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009). In assessing the reasonableness of the lodestar figure, the Court considers the twelve factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) and adopted by the Fourth Circuit in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978). These factors include:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of

the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Id. at 226 n.28.[4] "Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones . . . . Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013), as amended (Jan. 23, 2014) (internal quotation marks and citations omitted).

## III.   ANALYSIS

### A.  Calculating the lodestar figure

#### 1.   Reasonable hourly rate

There is no question that plaintiffs' hourly rate was reasonable. James Rubinger, the attorney who performed most of the work in this action and who has 40 years of experience, charges only $400 per hour,[5] which is significantly less than the $505 to $820 per hour that is considered reasonable under the Vienna Metro matrix[6] for attorneys in Northern Virginia with Rubinger's level of experience. See Taylor v. Republic Servs., Inc., No. 1:12-cv-523, 2014 WL 325169, at *5 (E.D. Va. Jan. 29, 2014) (citing Vienna Metro LLC v. Pulte Home Corp., 786 F.

---

[4] The Fourth Circuit has recognized that "to the extent that any of [the Johnson factors] has already been incorporated into the lodestar analysis, we do not consider [those factors] a second time." E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs, 724 F.3d 561, 570 (4th Cir. 2013); see also Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 553 (2010).

[5] For the time entries in 2018, Rubinger's hourly rate was only $390, but it increased to $400 in February 2019.

[6] "The matrix's hourly rate calculation accounts for [Johnson] 'factors (3) skill required, (5) customary fee, (9) the experience, reputation, and ability of the attorney, and (12) fee awards in similar cases by providing a stable and consistent rate' for northern Virginia attorneys, 'based on their skill in commercial litigation cases and years of experience.'" Gomez v. Seoul Gool Dae Gee Inc., No. 1:19-cv-1121, 2020 WL 354313, at *2 (E.D. Va. Jan. 21, 2020) (internal quotation marks and citation omitted).

Supp. 2d 1090 (E.D. Va. 2011)). The $200 and $275 per hour charged by the associates and the $125 per hour charged by the experienced legal assistants who worked on this matter were also reasonable rates under this matrix. Defendants concede that the rates charged are reasonable; however, they argue that because Rubinger should have delegated more of the work to associates, the rates for all counsel should be reduced to $337.50, or the average of Rubinger's $400/hour rate and the associates' $275/hour rate. This argument fails because it neglects to take into account that the hourly rates charged by the associates are themselves quite low. For example, John W. Edson, an associate with four years of experience, charged only $275 per hour for his time, when the reasonable range for attorneys with his level of experience is $350-600 under the Vienna Metro matrix. Accordingly, even if Rubinger had delegated more of the work to his associates, those associates could reasonably have charged more than the $337.50 defendants propose. For these reasons, a rate of $400/hour for Rubinger, the $275 and $200/hour rates depending on experience for associates, and the $125/hour rate for legal assistants was reasonable.

    2.  Reasonable number of hours

Plaintiffs' counsel has requested fees for a total of 424.1 hours. As described above, this calculation appears to be an error; the hours listed in the chart plaintiffs have submitted add up to a total of 417.7 hours. Except as described below, the amount of time plaintiffs' counsel spent on this action was reasonable. As plaintiffs point out, the case was staffed leanly, with Rubinger doing almost all of the work. To the extent Rubinger spent more hours than might have been expected on a franchise dispute, that was in part due to defendants' litigation positions. For example, although the action might have been resolved quickly after the entry of the preliminary injunction, defendants complicated matters by bringing dubious counterclaims seeking $2

million in damages. Defendants also brought a motion to dismiss which was denied because their arguments were mostly "form over substance." [Dkt. No. 49] at 4. The withdrawal of defendants' counsel the day after the futile settlement conference due to a "fundamental disagreement" over how to proceed in this action further demonstrates that defendants' adherence to unreasonable positions made this action more complex and time consuming than it otherwise might have been.

Although defendants argue that plaintiffs should not be rewarded for invoking the "nuclear option" of terminating the franchise, plaintiffs' decision to terminate the franchise was entirely reasonable. It is untenable to suggest, as defendants do, that plaintiffs should have been required to allow defendants to sustain their franchise when defendants had repeatedly been late in paying royalties, made and acted on threats to prevent AFCF from accessing their account, appeared to be insolvent and in default on their obligations to numerous other creditors, and continued to operate an urgent care center for some time under the AFC Marks even after the Franchise Agreement was terminated. Contrary to defendants' argument, an award of attorneys' fees in this action will not "reward" plaintiffs; instead, it will reasonably compensate them for their efforts to protect their contractual and trademark rights.

Although many of the hours plaintiffs requested are reasonable, some reductions are appropriate. First, plaintiffs' counsel charged a total of $39,390 to prepare the summary judgment motion and reply brief, [Dkt. No. 94-1] at 7, which equals approximately 98.5 hours of Rubinger's time. Defendants persuasively argue that this is about twice as long as it should have taken given that plaintiffs had already addressed some of the same issues in their motion for a temporary restraining order,[7] and that as an experienced lawyer who specializes in franchise

---

[7] Defendants' argument solely referenced the summary judgment brief, but the argument applies equally to the reply brief.

issues, Rubinger should not have needed to spend that much time on these briefs. The Court

agrees with that argument. Accordingly, a reduction of 49 hours is appropriate. Second, plaintiffs

have charged 0.7 hours for time spent by two other partners on this matter. Given that a partner

was already performing most of the work on this action, it is not clear why it was necessary to

obtain the assistance of two other partners. Accordingly, that charge will be removed from the

lodestar. Third, defendants persuasively argue that Rubinger engaged in pedestrian activities

such as delivering courtesy copies of filings to the court himself, when he could have simply

hired a courier. The Court agrees that this was not a reasonable expenditure of time for a partner,

and accordingly the 1.5 hours he spent on that task[8] will be removed from the lodestar. Finally,

defendants point out that the December 2019 invoice, which totaled 11.2 hours, represents

charges related to representing AFCF in a separate lawsuit against defendants by their former

landlord, including participating in a deposition and attending the trial in that case. The Court

agrees that because those hours were related to a different lawsuit, they should be excluded from

the lodestar. Accordingly, the lodestar figure is reduced to $128,957.50, which represents a total

of 355.3 hours[9] multiplied by the hourly rate of $400 for Rubinger, $200 or $275 for the

associates, and $125 for the legal assistants.

     3. <u>Johnson factors</u>

---

[8] These tasks were performed on November 2, 2018 and January 21, 2020. The relevant time entry from November 2018 states: "Deliver courtesy copies to court. Emails with Chester re hearing date and attaching filed copies. Review issued summonses and send to process server." [Dkt. No. 94-2] at 8. Because this time entry was block billed, it is impossible to determine exactly how much time Rubinger spent delivering the summons and complaint to the court. Given that block billing is disfavored, the entire 1.2 hours from this time entry will be removed.

[9] The breakdown of hours by attorney is as follows: 299.5 for James Rubinger, 10.5 hours for associate John W. Edson, 8.1 hours for associate Margaret Naylor, 17.1 hours for legal assistant Elizabeth Brugger, 20.1 hours for legal assistant Kimberli Cox.

Most of the <u>Johnson</u> factors have already been subsumed in the Court's lodestar analysis, and none of the factors warrant additional reductions or enhancements for the following reasons.

a.   <u>The time and labor expended</u>

The Court incorporated this factor into its analysis of the lodestar, and no further adjustment is appropriate.

b.   <u>The novelty and difficulty of the questions raised</u>

Although defendants made the litigation more challenging by, for example, taking an unreasonable position with respect to damages and refusing to concede it, the legal issues involved in this case were otherwise not particularly novel or difficult. Accordingly, no adjustment on this basis is appropriate.

c.   <u>The skill required to properly perform the legal services rendered</u>

The Court incorporated this factor into its analysis of the lodestar, and no further adjustment is appropriate.

d.   <u>The attorney's opportunity costs in pressing the instant litigation</u>

Counsel's opportunity costs in pursuing the instant litigation do not appear to have been particularly unusual or notable; accordingly, no adjustment on this basis is appropriate.

e.   <u>The customary fee for like work</u>

The Court incorporated this factor into its analysis of the lodestar, and no further adjustment is appropriate. Moreover, recent case law confirms that the fees charged by plaintiffs' counsel were reasonable. <u>See, e.g.</u>, <u>Valador, Inc. v. HTC Corp.</u>, No. 1:16-cv-1162, 2018 WL 4940721, at *11 (E.D. Va. May 30, 2018), <u>report and recommendation adopted sub nom. Valador, Inc.</u>, No. 1:16-cv-1162, 2018 WL 4937057 (E.D. Va. Oct. 10, 2018) (finding rates of

13

$485 or $500 per hour for partners and $325 per hour for associates to be reasonable); <u>Two Men</u> <u>and a Truck/Intern., Inc. v. A Mover, Inc.</u>, 128 F.Supp.3d 919, 927 (E.D. Va. 2015) (finding reasonable a rate of $600 per hour for a partner, $400 per hour for an associate, and $250 per hour for a paralegal). Notably, less than a month ago, a court in the United States District Court for the District of Maryland found that the rates charged by Rubinger and his firm were reasonable. See <u>ICENY USA, LLC v. M&M'S, LLC</u>, No. 19-cv-2418, 2020 WL 1890511, at *5 (D. Md. Apr. 16, 2020),

f.   <u>The attorney's expectations at the outset of the litigation</u>

There is no evidence that there was anything unusual or notable about plaintiffs' counsel's expectations at the outset of the litigation that would warrant an adjustment.

g.   <u>The time limitations imposed by the client or circumstances</u>

There do not appear to have been unique time limitations imposed in this case. Accordingly, no adjustment on this basis is warranted.

h.   <u>The amount in controversy and the results obtained</u>

The lodestar figure is consistent with the amount in controversy and the results obtained in this action. Although the attorneys' fees sought exceed the amount of damages obtained, plaintiffs correctly point out that their central goal in this litigation was to obtain an injunction preventing defendants from continuing to use their marks, which they successfully achieved. They also successfully defended against defendants' counterclaims for $2 million.

i.   <u>The experience, reputation and ability of the attorney</u>

The Court incorporated this factor into its analysis of the lodestar, and no further adjustment is appropriate.

j.   <u>The undesirability of the case within the legal community in</u> <u>which the suit arose</u>

14

This case does not appear to have been particularly desirable or undesirable, and accordingly no adjustment on this basis is appropriate.

### k. The nature and length of the professional relationship between attorney and client

There is no indication that the nature and length of the professional relationship between plaintiffs and their counsel had any particular impact on this action, and accordingly no adjustment on this basis is appropriate.

### l. Attorneys' fees awards in similar cases

The Court incorporated this factor into its analysis of the lodestar, and no further adjustment is appropriate. Although the lodestar figure is higher than in some other franchise cases, this figure is appropriate given that this action involved counterclaims and required defending against multiple motions filed by defendants.

### B. Successful and unsuccessful claims and degree of success

Plaintiffs were very successful in this action. Although they did not succeed on their claim for lost future profits, plaintiffs have already excluded the time spent on that claim from their fee request, and they succeeded on every other substantive motion during this litigation. Moreover, as described above, plaintiffs achieved their central goal in bringing this litigation, namely obtaining an injunction preventing defendants from continuing to use their marks. Accordingly, no further adjustment on this basis is appropriate.

### C. Costs

Defendants do not contest that the $3,206.73 in costs are reasonable. The Court agrees that these costs, which were spent on common litigation expenses such as Federal Express delivery, filing fees, service of process, deposition services, and travel costs, are reasonable.

IV.   <u>CONCLUSION</u>

For the reasons stated above, plaintiffs' motion will be granted in part and plaintiffs will be awarded a total of $132,164.23, consisting of $128,957.50 for attorneys' fees and $3,206.73 for costs, by an Order to be issued with this Memorandum Opinion.

Entered this 8th day of May, 2020.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge